**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **JOSEPH MAHER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Docket No. 04CV-12367-EFH** |
| | ) | |
| **GSI LUMONICS, INC.,** | ) | |
| **And CHARLES WINSTON** | ) | |
| **Defendant.** | ) | |

**PLAINTIFF'S OPPOSITION TO DEFENDANT, GSI'S,**
**MOTION FOR SUMMARY JUDGMENT**

**I.    STATEMENT OF THE CASE**

On or about January 29, 2003, Plaintiff Joseph A. Maher, Jr. ("Mr. Maher" or "Plaintiff") filed a complaint with five counts alleging various claims of age discrimination, breach of covenant of good faith and fair dealing, violation of the Older Worker Benefits' Protection Act (OWBPA) and Retaliation relating to his termination from employment with Defendant GSI Lumonics, Inc. ("GSI" or "Defendant") on September 13, 2002 at age 54.    This Court issued Summary Judgment in favor of GSI on the Federal Counts in that complaint, and transferred the remaining counts to Essex Superior Court, as if the case had initially been removed from state court.  Judge Billings dismissed the case, because it was not properly before the Superior Court.  On or about August 27, 2004, Mr. Maher filed a new complaint, asserting the following Counts against GSI:  Count I, Age Discrimination under M.G.L. c. 151B; Count II Breach of the Covenant of Good Faith and Fair Dealing; and Count III, violation of public policy.  The

1

plaintiff opposes GSI's Motion for Summary Judgment on these three counts on the grounds set forth below.

**II.    STATEMENT OF FACTS**

In addition to the "Plaintiff's Response to Defendant's Concise Statement of Material Facts" submitted herewith, Plaintiff includes the following brief Statement of Facts.

**A. Background and Hiring of Mr. Maher**

Mr. Maher was employed by GSI from May 22, 2001 through September 13, 2002, first as General Manager of GSI's Semiconductor Division, and beginning in November, 2001, as Vice-President and General Manager. Maher Tr., 72 (EXHIBIT A); October 2001 GSI News Release (EXHIBIT B).[1] He reported directly to the President of GSI, Charles Winston ("Mr. Winston"). Winston Tr., 18. (EXHIBIT C).

In the fall of 2001, Mr. Maher expressed to Linda Palmer ("Ms. Palmer"), head of Human Resources at GSI, that he was interested in interviewing for the open position of COO. Mr. Maher became aware of the opening when he was asked to assist GSI in interviewing candidates. Maher Tr., 77, 81-82, 83, lines 1-2. (EXHIBIT A). During Mr. Maher's conversation with Ms. Palmer in regard thereto, Ms. Palmer stated that management was surprised that Mr. Maher would have interest in the position, since, due to his age, they had only expected him to work for the company for a couple of years, and then they had anticipated that he would retire. Maher Tr., 83, lines 6-7, 84, lines 10-13. (EXHIBIT A). Mr. Maher then discussed his interest in the position with Mr. Winston, who also made a reference to Mr. Maher's age, stating that he was concerned that Mr. Maher was going to retire in the near future. Maher Tr., 90, lines 12-24. (EXHIBIT A).

---

[1] Due to the voluminous nature of the exhibits, they have not been filed electronically.

Ultimately, Mr. Maher was not hired for the COO position. <u>Winston Tr.,</u> 42-43, Exhibit (EXHIBIT C).

GSI decided to promote Mr. Maher to Vice President in the fall of 2001. <u>See October 2001 GSI News Release</u> (EXHIBIT B). While Mr. Maher and Mr. Winston did not see eye to eye on a number of issues, Mr. Maher was performing in a satisfactory manner. Mr. Winston sent Mr. Maher an e-mail on or about May 22, 2002 stating that Mr. Maher was focused on the right issues. <u>May 22, 2002 Winston email to Maher</u>. (EXHIBIT D).

In approximately July or August, 2002, Mr. Winston expressed concern that Mr. Maher was thinking of leaving the company. <u>Maher Tr.,</u> 162, lines 15-24, 164, lines 8-11. (EXHIBIT A) Mr. Maher assured Mr. Winston that he was not considering leaving. <u>Maher Tr.,</u> 164, lines 14-17, 166, lines 13-15., 168, lines 6-7. (EXHIBIT A). At this time, Mr. Winston stated that he was pleased with Mr. Maher's performance. <u>December 19, 2002 Attachment to Maher MCAD charge of discrimination (attested to by Mr. Maher)</u>. (EXHIBIT E). Additionally, the Plaintiff submitted an e-mail to his employer on September, 2002, outlining his significant accomplishments during his employment. <u>September 18, 2002, Maher e-mail to Palmer</u>. (EXHIBIT F).

3

B.    **Termination Decision**

On September 6, 2002, while on vacation, Mr. Maher was asked to attend, and did attend, a special executive teleconference meeting, called by Mr. Winston. <u>Maher Tr.</u>, 185, lines 5-10. (EXHIBIT A). Mr. Maher attended the meeting for approximately four hours, and he believed that all of the issues for which the meeting was called had been discussed. <u>Maher Tr.</u>, 181-82. (EXHIBIT A). After excusing himself and noting he needed to leave, Mr. Maher exited the special meeting. <u>Maher Tr.</u>, 182. (EXHIBIT A). There is no allegation that Mr. Maher stormed out of the meeting or was otherwise disruptive to the discussion. Mr. Winston testified that the meeting continued for another 15 to 20 minutes after Mr. Maher's departure. <u>Winston Tr.</u> 70. (EXHIBIT C). Mr. Maher apologized to Mr. Winston when he heard from the other individuals attending the meeting that Mr. Winston was upset because he left the meeting. <u>Maher Tr.</u>, 193. (EXHIBIT A).

On September 13, 2002, Mr. Winston and Mr. Maher met (at Mr. Maher's request) and discussed at length a number of issues pertaining to the Semiconductor division. <u>Maher Tr.</u>, 190, 191, lines 1-12. (EXHIBIT A). At the end of this meeting, Mr. Winston informed Mr. Maher he was being terminated due to his insubordination in leaving the meeting on September 6, 2002. <u>Maher Tr.</u>, 191. (EXHIBIT A). Prior thereto, Mr. Winston had not said anything to Mr. Maher regarding Mr. Maher leaving the meeting. <u>Winston Tr.</u>, 74, lines 12-4, 75, lines 1-2. (EXHIBIT C). Mr. Winston later stated that Mr. Maher had acted in an insubordinate manner previously, by hanging up on him on a prior occasion. Mr. Maher denies that this ever occurred. <u>Maher Tr.</u>, 105, lines 14-24, 106, lines 1-24, 116, lines 1-12, 197, lines 16-20, 198, 1-5. (EXHIBIT A).

4

Mr. Maher wrote an e-mail to Mr. Winston on September 15, 2002, asking that Mr. Winston that he reconsider his decision.  September 15, 2002, Maher e-mail to Winston.  (EXHIBIT G).  Mr. Winston never responded to Mr. Maher's request to reconsider.  September 18, 2002, Maher e-mail to Palmer.  (EXHIBIT F).

**C.    Offer of Severance**

On September 13, 2002, subsequent to his termination by Mr. Winston, Mr. Maher briefly met with Ms. Palmer to quickly discuss the broad parameters of a severance package and certain COBRA and human resource related issues.  Maher Tr., 203, lines 20-24, 204, lines 1-7. (EXHIBIT A).  Maher did not receive a full and formal severance offer on September 13, 2002 during this meeting with Ms. Palmer.  Maher Tr., 203, lines 20-24, 204. (EXHIBIT A). Ms. Palmer provided draft and incomplete severance proposal documentation and noted to Mr. Maher that a more formal package would be issued to him thereafter.  Maher Tr., 204, lines 22-24, 205, 1-24, 206, 1-12, 208, lines 8-19. (EXHIBIT A).

On or about September 18, 2002, Mr. Maher contacted Ms. Palmer, stating that he still had not received the final Severance Agreement provided on September 13, 2002.  Mr. Maher also informed Ms. Palmer, that upon reviewing his materials, he had become aware that he only had two pages of the draft Severance Agreement. September 18, 2002, Maher e-mail to Palmer.  (EXHIBIT F).  Later on September 18th (after normal business hours), Mr. Maher received (for the first time), a formal offer of severance in the form of a complete Severance Agreement form faxed to his attention in which GSI offered him three months severance pay, and gave him 45 days (from receipt thereof) to consider the

5

offer.  See September 30, 2002 email string between Palmer and Maher.  (EXHIBIT H);
GSI Severance Letter Offer.  (EXHIBIT I).

The Severance Agreement specifically provided that if Mr. Maher accepted the offer, he would waive his right to any other compensation from the Defendant, by noting his entitlement to a three (3) month base salary continuation, health benefits and stock options, specifically stating "*You will be entitled to the payments and benefits described above and no other payments or benefits.*" (emphasis added).  GSI Severance Letter Offer.  (EXHIBIT I).  In exchange for the proposed severance, the agreement as outlined, called for Mr. Maher to fully release GSI from all potential claims relative to his employment.  GSI Severance Letter Offer.  (EXHIBIT I).  Mr. Maher responded to the Severance Agreement by noting his accomplishments, requesting that he receive six months severance pay, and, asking if he was still eligible for bonus consideration.  September 18, 2002, Maher e-mail to Palmer.  (EXHIBIT F).

On September 30, 2002, Linda Palmer, e-mailed Mr. Maher, and told him that GSI was not willing to give him any additional severance.  September 30, 2002 email string between Palmer and Maher.  (EXHIBIT H).  Ms. Palmer also stated that, "any earned bonus is paid after the year end audit is complete."  September 30, 2002 email string between Palmer and Maher. (EXHIBIT H).

Thereafter, Mr. Maher retained counsel, who, on or about October 9, 2002, requested Mr. Maher's personnel file, in order to obtain a copy of the letter describing the bonus plan, which Mr. Maher did not have in his possession.  See October 9, 2002 Correspondence from Plaintiff's Counsel to Casal.  (EXHIBIT J).  On or about October 23, 2002, Mr. Maher's counsel requested an extension of the 45 day deadline, which was

due to expire on November 4, 2002, to December 20, 2002, due to the language of the release accompanying the severance package that specifically stated that Mr. Maher would be waiving any rights to future payments. <u>GSI Severance Letter Offer</u>. (EXHIBIT I); <u>October 23, 2002 correspondence from Plaintiff's counsel to Casal.</u> (EXHIBIT K).

Prior to November 4th, 2002, GSI provided no communication or assurance that this language, which was inconsistent with Ms. Palmer's representation that Mr. Maher would be eligible for any earned bonus after the year-end calculations were completed, would not preclude his right to receive his earned compensation in the form of his bonus. <u>See November 11, 2002 Correspondence from Plaintiff's counsel to Casal.</u> (EXHIBIT L); <u>GSI Severance Letter Offer</u>. (EXHIBIT I); <u>September 30, 2002 email string between Palmer and Maher</u>. (EXHIBIT H).

During the business week of October 20-25, 2002, numerous messages were left by Mr. Maher's counsel for GSI's General Counsel to no avail. <u>See November 11, 2002 Correspondence from Plaintiff's counsel to Casal</u>. (EXHIBIT L). Mr. Maher's counsel also called on several other occasions the following week. <u>See November 11, 2002 Correspondence from Plaintiff's counsel to Casal</u>. (EXHIBIT L). On November 7, 2002, GSI's General Counsel confirmed that "GSI was not prepared to modify the Separation Agreement that was previously provided to Mr. Maher to carve out any entitlement to a year end incentive pay out". <u>November 7, 2002 Casal email to Plaintiff's Counsel.</u> (EXHIBIT M). GSI thereby confirmed that it did intended for the Severance Agreement to preclude the Plaintiff from receiving his bonus.

Further, GSI's General Counsel informed Mr. Maher's counsel, that not only were they not going to allow an extension of time requested to clarify the issue of eligibility for

7

the bonus, but that, by their calculation, the deadline for acceptance of the severance offer had already passed.  See November 8, 2002 email string between Casal and Plaintiff's Counsel. (EXHIBIT N).  However, GSI noted to Plaintiff's counsel that she was unaware that Mr. Maher had received a prior written acknowledgment from Linda Palmer concerning Mr. Maher's bonus, and that she would revisit these issues with Mr. Winston.  See November 8, 2002 email string between Casal and Plaintiff's Counsel. (EXHIBIT N).  Subsequently, Mr. Winston decided that GSI would not acknowledge that Mr. Maher could receive both the severance and the bonus, nor would it reconsider its position that the deadline had passed prior to GSI clarifying its interpretations of the Severance Agreement.  See Palmer Tr., 74, lines 6-9.  (EXHIBIT O).

**Comment:**

**Comment:**

## ARGUMENT

### Summary Judgment Standard

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to a material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

Once the moving party has asserted that no genuine issue of material fact exists, the burden is on the opposing party to point to specific facts demonstrating that there is, indeed, a trialworthy issue. Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995).  In order to survive summary judgment, however, a plaintiff is not required to rely only on uncontradicted evidence. Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 9 n.3 (1st Cir. 1990).  Where, as in the instant case, the record as a whole presents many inconsistencies, the factfinder must be allowed to determine

which version of the facts is most compelling.   Calero-Cerezo v. United States Department of Justice, 2004 U.S. App. Lexis 452 at page 26. (Jan. 14, 2004).

### A.  The Doctrine of Res Judicata Does not Apply to This Case

In the Kale case, cited by the Defendant in support of its Argument regarding res judicata, Judge Skinner dismissed Kale's claim without prejudice. See Kale v. Combined Insurance Companies of America, 924 F.2d 1161 (1st Cir 1991).  Therefore, as stated in Kale, because of the **dismissal of the state law claims**, there was an adjudication for the purposes of the federal court.  Here, there was no dismissal of the state law claims by the federal court.  Rather, this Court declined jurisdiction over the state law claims, and ordered them transferred to the state court.  Because there was no dismissal without prejudice of the state law claims, there could have been no appeal of the dismissal order.  The Kale court identified the failure to appeal the dismissal order (presumably on the grounds of diversity jurisdiction) as one of Kale's principal missteps.  Id. at 1164.

The defendant attempts to use Judge Billings' dismissal without prejudice to supply the missing element from the Kale case.  However, under the Massachusetts Rules of Civil Procedure, Rule 41(b)(3), the dismissal by Judge Billings was essentially a dismissal for lack of jurisdiction, and thus does not qualify as an adjudication on the merits.  Further, Judge Billings' comments at the hearing specifically contemplated the filing of a new Complaint.  Therefore, the dismissal by Judge Billings, when combined with his comments at oral argument "expressly reserved the plaintiff's right to maintain the second action."  Restatement (Second) of Judgments § 26(1)(b) (1982).

Further, the Court was aware of the existence of diversity jurisdiction, since the plaintiff clearly indicated, in its Complaint, that GSI is a Canadian corporation with a

9

place of business in Billerica.  The <u>Kale</u> decision indicates that the diversity grounds for jurisdiction were withheld from the judge. <u>Id</u>. at 1166-67.  Here, the diversity grounds were clear on the face of the Complaint.  In the <u>Shaver</u> case, the Court also relied on the fact that Shaver had not included diversity in his Complaint as a ground for stating that he had failed to inform the court that additional grounds for jurisdiction existed.  <u>See</u>  <u>Shaver v. F.W. Woolworth Co.</u>, 840 F.2d 1361 (7th Cir), <u>cert denied</u> 488 U.S. 856 (1988).

Rather, this case is more like <u>Epperson v. Entertainment Express, Inc.</u>, in which the alternative grounds for jurisdiction were alleged, but rejected by the Court.  <u>Epperson v. Entertainment Express, Inc.</u>, 242 F.3d. 100 (2001).  In that case, the Second Circuit stated:  "because the appellants in this case neither failed in the first action to allege a jurisdictional ground that would have permitted a unified resolution of their claims, nor seek in the second action to relitigate a jurisdictional issue that has been considered and rejected by the district court, they are not barred by the principles of res juducata…"  <u>See</u> <u>Id.</u> at 110.

Finally, this court has "recognized the existence of judicial power to make an 'occasional exception' to claim preclusion in order 'to prevent undue hardship.'"  <u>See</u> <u>Kale</u>, 924 F.2d at 1168 (<u>quoting</u> <u>Rose v. Town of Harwich</u>, 778 F.2d 77, 82 (1st Cir. 1985)).  Based upon the specific procedural facts set forth above, such an exception should be made.

**B.  <u>State Law Requires the Application of a Different Standard in Reference to The Plaintiff's Age Discrimination Claim</u>**

Massachusetts case law required that a different standard be applied to the facts than that which applies to claims under the Federal Age Discrimination statute. See Joyal v. Hasbro, Inc., 380 F.3d 14, 17 (1st Cir. 2004). In Joyal, the court stated:

> Under Massachusetts law, as under federal law, the employer's provision of a non-discriminatory reason or reasons rebuts the presumption of discrimination created by the prima facie case, and the issue of discriminatory intent then turns upon the evidence. Abramian v. President & Fellows of Harvard Coll., 432 Mass. 107, 731 N.E.2d 1075, 1084-86 (2000) Under federal law, that evidence may include inferences drawn against the employer if his alleged reason or reasons for the adverse action are shown to be "pretextual." Udo v. Tomes, 54 F.3d 9, 12-13 (1st Cir. 1995).
>
> Massachusetts law is similar, but in one relevant respect perhaps even friendlier to plaintiffs. Under Lipchitz v. Raytheon Co., 434 Mass. 493, 751 N.E.2d 360, 366 (Mass. 2001), a plaintiff may be able--automatically and regardless of circumstances--to avoid a directed verdict and reach a jury if he or she proves that at least one of the reasons given by the defendant was pretextual.

Here, there is an additional consideration regarding the issue of whether a reason is pretext which is not present in the Federal case law. A reason may be disbelieved by a fact finder where the alleged reason for the termination appears, on its face, not to be credible. See e.g. Holland v. BLH Electronics, Inc., 58 Mass. App. Ct. 678, 683-84 (2003) (summary judgment not awarded where employer's assertion that employee was terminated for insubordination was not credible in light of facts in the record).

Further, Massachusetts does not draw such a bright line as to the difference in age between the terminated individual and his replacement as the defendant would have the Court believe. The Defendant states that under the theory advanced in the case of Knight v. Avon Products, 438 Mass. 413 (2003), the plaintiff cannot survive summary judgment. The Knight Court stated that a small difference in age between the individual who was terminated, and the individual by whom the plaintiff is replaced, *by itself* is not sufficient to support prima facie case of age discrimination. The Knight Court went on to state, however, that:

We now explain the "by itself" qualification. The fact that someone over forty years old is terminated and replaced by someone less than five years younger, of course, does not by itself negate the possibility that the termination was motivated by the plaintiff's age. Although a bright-line standard of five years is useful, it should not be used to exclude a plaintiff who might otherwise have evidence showing that age was a factor. As was perceptively stated by one court: "The line we draw is not so bright as to exclude cases where the gap is smaller but evidence nevertheless reveals the employer's decision to be motivated by the plaintiff's age." Hartley v. Wisconsin Bell, Inc., 124 F.3d 887, 893 (7th Cir. 1997). In an indirect evidence case when the disparity in age is less than five years, therefore, a plaintiff still may present a triable claim if there is other evidence that the termination occurred in circumstances that would raise a reasonable inference of unlawful age discrimination.

Knight v. Avon Products, 438 Mass. 413, 426 (2003).  As shown below, the plaintiff has

supplied additional evidence of age discrimination.

### C. **The Plaintiff has Presented Sufficient Material Facts in Dispute to Overcome Summary Judgment on the State Age Discrimination Claim**

The Defendant alleges that the Plaintiff has presented, and cannot present direct

evidence of discriminatory animus on the part of the employer.  This assertion is not true.

The Plaintiff testified to several statements made by both Charles Winston and Linda

Palmer which indicate that the employer was motivated to make decisions based upon

age.  Direct evidence is evidence that, "if believed, results in an inescapable, or at least

highly probable, inference that a forbidden bias was present in the workplace." Wynn &

Wynn, P.C. v. Mass. Comm'n Against Discrimination, 431 Mass. 655, 667, 729 N.E.2d

1068 (2000) (quoting Johansen v. NCR Comten, Inc., 30 Mass. App. Ct. 294, 300, 568

N.E.2d 611 (1991)). Typically, direct evidence consists of statements of discriminatory

intent attributable to an employer. Wynn, 431 Mass. at 667-68.

In the instant case, the Plaintiff testified that, Linda Palmer, the Head of GSI

Human Resources, discussed with Plaintiff the possibility of applying for the COO

12

position which had been created within the company.  The Plaintiff stated that Ms.
Palmer said that she was surprised he would be interested in the position, because she
thought that he would be retiring in the near future.  See Maher Tr., 83 (EXHIBIT A).
The Plaintiff also testified that Mr. Winston made similar remarks during an interview
with Mr. Maher for the COO position. Maher Tr., 91-92 (EXHIBIT A).

Although the statements outlined above were made in the context of the COO
hiring decision, evidence that an employer, acting through its officials and managers,
considered an impermissible factor in other employment matters can support a conclusion
that the same unlawful bias was at work in other employment decisions.  Lewis v. Area II
Homecare for Senior Citizens, Inc., 397 Mass. 761, 767, 493 N.E.2d 867, 871-72 (1986);
Smith College v. MCAD, 376 Mass. 221, 228 & n.9, 380 N.E.2d 121, 125 & n.9 (1978);
Johansen v. NCR Comten, Inc., 30 Mass.App.Ct. 294, 298, 568 N.E.2d 611, 613 (1991).

Even disregarding the Plaintiff's direct evidence, however, the Plaintiff has
presented facts which support his claim of discrimination under the three-stage burden-
shifting analysis first articulated by the Supreme Court of the United States in McDonnell
Douglas Corp. v. Green, 411 U.S. 792, 802, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973), and
adopted by Massachusetts in Wheelock College, 371 Mass. at 134-37.

The first stage requires the plaintiff to establish a prima facie case of
discrimination.  McDonnell Douglas, 411 U.S. at 802. A prima facie case, once
established, "creates a presumption of discrimination." That presumption of
discrimination may be rebutted in the second stage of the analysis if the employer can
articulate "a legitimate, non-discriminatory reason for its action" backed by "credible
evidence [showing] that the reason or reasons advanced were the real reasons" Wheelock

13

<u>College</u>, 371 Mass. at 136, 138. Finally, if an employer presents a non-discriminatory reason for its decision with an adequate evidentiary backing, the plaintiff must persuade the trier of fact by a preponderance of the evidence that discriminatory animus was the "determinative cause" for the employer's decision. A fact-finder's decision in this third stage may be based, either in whole or in part, on a determination that a legitimate reason for the employer's decision advanced in stage two was actually a pretext.

Generally, a plaintiff must make four showings to establish a prima facie case of discrimination: (1) the plaintiff is a member of a protected class; (2) the employer took an adverse employment action against him/her; (3) the plaintiff was qualified for the job; and (4) after the plaintiff's departure, that position remained open or the employer sought someone of roughly equivalent qualifications to perform substantially the same work. <u>Straughn v. Delta Air Lines, Inc.</u>, 250 F.3d 23, 33 (1st Cir. 2001); <u>Feliciano de la Cruz v. El Conquistador Resort and Country Club,</u> 218 F.3d 1, 5 (1st Cir. 2000). The precise requirements of a prima facie case can vary depending on context and were "never intended to be rigid, mechanized, or ritualistic." <u>Furnco Constr. Corp. v. Waters</u>, 438 U.S. 567, 577, 57 L. Ed. 2d 957, 98 S. Ct. 2943 (1978).

Here, it is undisputed that the Plaintiff was a member of a protected class. He was 54 at the time of the termination. The Plaintiff has presented evidence that he was qualified for his position, as is shown by the Plaintiff's promotion; Mr. Winston's e-mail of May 22, 2002 stating that Mr. Maher was focused on the right issues; Mr. Winston's statement made in July or August of 2002, that Mr. Winston was pleased with his performance; and the Plaintiff's own testimony regarding his accomplishments. It is undisputed that the employer sought someone of roughly equivalent qualifications to perform substantially

14

the same work.  Therefore the Defendant's assertion that the Plaintiff has not put forth sufficient evidence to create a prima facie case is false and erroneous.

As mentioned above, after the plaintiff establishes his prima facie case, the burden of going forward shifts to the defendant to rebut the inference of discrimination by articulating a legitimate, non-discriminatory reason for the termination of the plaintiff's employment.  McDonnell Douglas Corp. v. Grenn, 411 U.S. 792, 802 n.13, 36 L. Ed. 2d 668, 93 S. Ct. 1817.

Here, the sole reason asserted for the Plaintiff's termination was insubordination. Palmer Tr. 60. (EXHIBIT O).  Mr. Winston stated that he was relying on two separate instances of insubordination, one where Mr. Maher hung up on him in a telephone call and, the other where Mr. Maher left a meeting on September 6, 2002.  Winston Tr. 72-73, 75 (EXHIBIT C); Palmer Tr. 60. (EXHIBIT O).  Mr. Maher disputes that he hung up on Mr. Winston as asserted.  Maher Tr. 105. (EXHIBIT A). [2]  Mr. Maher does not dispute that he left the meeting of September 6, 2002.  However, Mr. Maher testified that he had come in on a vacation day to attend the meeting, at the time Mr. Maher left the meeting, he had been there for four hours, and he believed that all of the issues for which the meeting was called had been discussed.  There is no allegation that Mr. Maher stormed out of the meeting or was otherwise disruptive to the discussion.  Mr. Winston testified that the meeting continued for another 15 to 20 minutes after Mr. Maher's departure. Winston Tr. 70. (EXHIBIT C).  Mr. Maher was motivated to apologize to Mr. Winston

---

[2] Q.    Do you recall a telephone conversation after your review and prior to September that you hung up on Mr. Winston"
 A.    That absolutely never happened.

15

when he heard from the other individuals attending the meeting that Mr. Winston was upset because he left the meeting.  Maher Tr. 193.  (EXHIBIT A).

As shown above, the Defendant did not terminate the Plaintiff for poor performance, however much the Defendant attempts to allude thereto in order to bolster its argument. The sole reason advanced for the Plaintiff's termination is that he left a lengthy meeting, held on a day that the Plaintiff was to be on vacation, fifteen to twenty minutes prior to its termination.  Given the fact that the Defendant had previously expressed sentiments indicating age bias, and the fact that the alleged reason for the termination appears in its face to be flimsy in the extreme, a finder of fact should be allowed to review the evidence. See e.g. Holland v. BLH Electronics, Inc., 58 Mass. App. Ct. 678, 683-84 (2003) (summary judgment not awarded where employer's assertion that employee was terminated for insubordination was not credible in light of facts in the record).

In the instant case, the Plaintiff has provided evidence in the form of direct statements indicating animus based upon age as required by Knight v. Avon Products, 438 Mass. 413, 426 (2003).  Therefore, this case can be distinguished from those cited by the Defendant for the proposition that a relatively small difference in age bars a claim of age discrimination.

**D.    The Plaintiff has stated a Claim for Breach of the Covenant of Good Faith and Fair Dealing**

The facts relevant to the Plaintiff's claim of Breach of the Covenant of Good Faith and Fair Dealing are re-stated below for the convenience of the Court.

On September 13, 2002, subsequent to his termination by Mr. Winston, Mr. Maher briefly met with Ms. Palmer to quickly discuss the broad parameters of a

16

severance package and certain COBRA and human resource related issues.  Maher Tr.,
203, lines 20-24, 204, lines 1-7. (EXHIBIT A).  Maher did not receive a full and formal
severance offer on September 13, 2002, during this meeting with Ms. Palmer.  Maher Tr.,
203, lines 20-24, 204. (EXHIBIT A). Ms. Palmer provided draft and incomplete
severance proposal documentation and noted to Mr. Maher that a more formal package
would be issued to him thereafter.  Maher Tr., 204, lines 22-24, 205, 1-24, 206, 1-12,
208, lines 8-19. (EXHIBIT A).

On or about September 18, 2002, Mr. Maher contacted Ms. Palmer, stating that he
still had not received the final Severance Agreement provided on September 13, 2002.
Mr. Maher also informed Ms. Palmer, that upon reviewing his materials, he had become
aware that he only had two pages of the draft Severance Agreement. September 18, 2002,
Maher e-mail to Palmer.  (EXHIBIT F).  Later on September 18th (after normal business
hours), Mr. Maher received (for the first time), a formal offer of severance in the form of
a complete Severance Agreement form faxed to his attention in which GSI offered him
three months severance pay, and gave him 45 days (from receipt thereof) to consider the
offer.  See September 30, 2002 email string between Palmer and Maher.  (EXHIBIT H);
GSI Severance Letter Offer.  (EXHIBIT I).

The Severance Agreement specifically provided that if Mr. Maher accepted the
offer, he would waive his right to any other compensation from the Defendant, by noting
his entitlement to a three (3) month base salary continuation, health benefits and stock
options, specifically stating "*You will be entitled to the payments and benefits described
above and no other payments or benefits.*" (emphasis added).  GSI Severance Letter
Offer.  (EXHIBIT I).  In exchange for the proposed severance, the agreement as outlined,

17

called for Mr. Maher to fully release GSI from all potential claims relative to his employment. <u>GSI Severance Letter Offer</u>. (EXHIBIT I). Mr. Maher responded to the Severance Agreement by noting his accomplishments, requesting that he receive six months severance pay, and, asking if he was still eligible for bonus consideration. <u>September 18, 2002, Maher e-mail to Palmer</u>. (EXHIBIT F).

On September 30, 2002, Linda Palmer, e-mailed Mr. Maher, and told him that GSI was not willing to give him any additional severance. <u>September 30, 2002 email string between Palmer and Maher.</u> (EXHIBIT H). Ms. Palmer also stated that, "any earned bonus is paid after the year end audit is complete." <u>September 30, 2002 email string between Palmer and Maher.</u> (EXHIBIT H).

Thereafter, Mr. Maher retained counsel, who, on or about October 9, 2002, requested Mr. Maher's personnel file, in order to obtain a copy of the letter describing the bonus plan, which Mr. Maher did not have in his possession. <u>See October 9, 2002 Correspondence from Plaintiff's Counsel to Casal</u>. (EXHIBIT J). On or about October 23, 2002, Mr. Maher's counsel requested an extension of the 45 day deadline, which was due to expire on November 4, 2002, to December 20, 2002, due to the language of the release accompanying the severance package that specifically stated that Mr. Maher would be waiving any rights to future payments. <u>GSI Severance Letter Offer</u>. (EXHIBIT I); <u>October 23, 2002 correspondence from Plaintiff's counsel to Casal.</u> (EXHIBIT K).

Prior to November 4th, 2002, GSI provided no communication or assurance that this language (contrary to Ms. Palmer's representation that Mr. Maher would be eligible for any earned bonus after the year-end calculations were completed) would not preclude his right to receive his earned compensation in the form of his bonus. <u>See November 11,</u>

2002 Correspondence from Plaintiff's counsel to Casal. (EXHIBIT L); GSI Severance Letter Offer. (EXHIBIT I); September 30, 2002 email string between Palmer and Maher. (EXHIBIT H).

During the business week of October 20-25, 2002, numerous messages were left by Mr. Maher's counsel for GSI's General Counsel to no avail. See November 11, 2002 Correspondence from Plaintiff's counsel to Casal. (EXHIBIT L). Mr. Maher's counsel also called on several other occasions the following week. See November 11, 2002 Correspondence from Plaintiff's counsel to Casal. (EXHIBIT L). On November 7, 2002, GSI's General Counsel confirmed that "GSI was not prepared to modify the Separation Agreement that was previously provided to Mr. Maher to carve out any entitlement to a year end incentive pay out". November 7, 2002 Casal email to Plaintiff's Counsel. (EXHIBIT M). Through this correspondence, GSI thereby confirmed that it intended for the Severance Agreement to preclude the Plaintiff from receiving his bonus.

Further, GSI's General Counsel informed Mr. Maher's counsel, that not only were they not going to allow an extension of time requested to clarify the issue of eligibility for the bonus, but that, by their calculation, the deadline for acceptance of the severance offer itself had already passed. See November 8, 2002 email string between Casal and Plaintiff's Counsel. (EXHIBIT N). However, GSI noted to Plaintiff's counsel that she was unaware that Mr. Maher had received a prior written acknowledgment from Linda Palmer concerning Mr. Maher's bonus, and that she would revisit these issues with Mr. Winston. See November 8, 2002 email string between Casal and Plaintiff's Counsel. (EXHIBIT N). Subsequently, Mr. Winston decided that GSI would not acknowledge that Mr. Maher could receive both the severance and the bonus, nor would it reconsider its

19

position that the deadline had passed prior to GSI clarifying its interpretations of the Severance Agreement.  See Palmer Tr., 74, lines 6-9.  (EXHIBIT O).

**Comment:**

Here, the actions of the Defendant were clearly in bad faith.  The Defendant failed to supply the Plaintiff with full and complete documentation of the terms of the Severance Package on September 13, 2002.   When the Plaintiff did receive the documentation, the terms of the Severance Agreement precluded entitlement to any bonus under the bonus incentive plan, as it stated specifically, "*You will be entitled to the payments and benefits described above and no other payments or benefits.*" (emphasis added).  GSI Severance Letter Offer.  (EXHIBIT I).  The Defendant failed and apparently evaded efforts to clarify that point until after, according to the Defendant, the deadline for acceptance of the severance itself had passed.

In Massachusetts, every contract is subject to an implied covenant of good faith and fair dealing.  Anthony's Pier Four, Inc. v. HBC Associates, 411 Mass. 451, 473 (1991).  "The implied covenant of good faith and fair dealing provides that 'neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract….'" Id. at 471, quoting Druker v. Roland Wm. Jutras Associates, 370 Mass.  383, 385 (1976).

Defendant's deliberate actions caused the alleged failure to contract behind which it now seeks to hide.  The Defendant made the severance offer, and then obstructed the Plaintiff's acceptance of that same offer by obstinately refusing to clarify the point regarding what the effect of signing the Severance Agreement would be upon the Plaintiff's ability to receive his bonus.  Clearly, the Defendant knew that the Plaintiff would have accepted the offer had the Defendant given him the answer which it now

claims was its intent all along, i.e., that it would have paid him the severance and the bonus.

In Massachusetts, Courts have applied this principle in two contexts having to do with employment relations: (1) where an employer terminates and employee to prevent him from receiving a benefit to which he is entitled; or (2) where the employer terminates the employee in a manner which is inconsistent with clearly established public policy. See e.g. Fortune v. National Cash Register Co., 373 Mass. 96, 100-10 (1997); Glaz v. Ralston Purina Co., 24 Mass. App. Ct. 386, 389-90 (1987).

Here, the actions taken by the employer, at and post-termination, violate a clearly established public policy. Under the OWBPA, one of the duties incumbent upon the employer is to supply the Plaintiff with clearly understandable information regarding exactly what the Plaintiff is to receive in exchange for his waiver. 29 U.S.C § 626 (f)(1)(A). Here, the Defendant never responded to the Plaintiff's queries regarding the meaning of the language of the offer.

The Defendant's actions taken in bad faith continued even after the inception of the litigation. The Defendant asserted, by way of deposition testimony, that its intention all along was to pay the Plaintiff his bonus. However, the contemporaneous communications from the Defendant's in-house counsel show that was not the Defendant's intent. On November 7, 2002, GSI's General Counsel confirmed that "GSI was not prepared to modify the Separation Agreement that was previously provided to Mr. Maher to carve out any entitlement to a year end incentive pay out". November 7, 2002 Casal email to Plaintiff's Counsel. (EXHIBIT M). As noted, this email confirmed

21

that GSI intended that the Severance Agreement to preclude the Plaintiff from receiving his bonus.

Because the actions of the Defendant violate public policy, the Court should find that the Defendant violated the Covenant of Good Faith and Fair Dealing as enunciated in the case of Glaz v. Ralston Purina Co., 24 Mass. App. Ct. 386, 389-90 (1987).

Further, on or about November 8, 2002, GSI's General Counsel agreed to revisit the issue of the bonus and the extension of time for the Plaintiff to sign the Agreement with Mr. Winston. See November 8, 2002 email string between Casal and Plaintiff's Counsel. (EXHIBIT N).  When the General Counsel agreed to revisit the issue of the bonus, and the extension of time for the Plaintiff to sign the Agreement it created a contractual duty of the Defendant to consider the proposal in good faith.  The Defendant failed to act in good faith in rejecting even the idea of allowing the Plaintiff an extension of time to sign the Severance Agreement without modification.

Most jurisdictions, including the First Circuit, recognize a cause of action for breach of contract to negotiate terms.  Fickes v. Sun Expert, Inc., 762 F. Supp. 998, 1001 (D. Mass. 1991).  See Copeland v. Baskin Robbins U.S.A., 96 Cal. App. 4th 1251, 117 Cal.Rptr.2d 875, 882 (Cal. Ct. App. 2002) ("most jurisdictions which have considered the questions have concluded that a cause of action will lie for a breach of a contract to negotiate the terms of an agreement."). See also Venture Assoc. Corp. v. Zenith Data Sys. Corp., 987 F.2d 429, 433 (7th Cir. 1993) (applying Illinois law); Channel Home Ctrs. v. Grossman, 795 F.2d 291, 298-300 (3rd Cir. 1986) (applying Pennsylvania law); Chase v. Consol. Foods Corp., 744 F.2d 566 (7th Cir. 1984) (applying Illinois law); Thompson v. Liquichimica of America, Inc., 481 F. Supp. 365, 366 (S.D.N.Y. 1979); Evans, Inc. v.

Tiffany & Co., 416 F. Supp. 224, 239 (N. D. Ill. 1976); Am. Broad. Co. v. Wolf, 52 N.Y.2d 394, 420 N.E.2d 363, 438 N.Y.S.2d 482 (N. Y. 1981); Itek Corp. v. Chicago Aerial Industries, Inc., 248 A.2d 625, 629 (Del. 1968).

Many modern commentators also support this conclusion. See E. Allan Farnsworth, Farnsworth on Contracts, § 3.26 at 363 (2d ed. 1998); Melvin Eisenberg, Symposium on the Law in the Twentieth Century: The Emergence of Dynamic Contract Law, 88 Cal. L. Rev. 1743, 1796-97 (2000); E. Allan Farnsworth, Precontractual Liability and Preliminary Agreements: Fair Dealing and Failed Negotiations, 87 Colum. L. Rev. 217, 273 (1987).

Here, the Defendant clearly breached its articulated agreement to revisit the issues advanced by Mr. Maher in good faith. The Defendant refused to timely confirm that the Severance Agreement did not preclude any right to a bonus. The Defendant refused to extend the deadline for Mr. Maher to sign the Severance Agreement so that Mr. Maher could determine the terms of the severance offer to know whether he would be waiving his right to any earned bonus if the executed the proposed severance agreement as written. Further, in a final show of bad faith, the Defendant refused to extend the deadline for Mr. Maher to sign the Severance Agreement, even when he indicated that he would sign it without any changes to the language contained therein, which, under the information he was being given by the Defendants at the time, would have waived his right to the bonus payment. The Defendant's action indicated that it seized on the opportunity to thwart Mr. Maher's efforts to receive the benefits offered under the Severance Agreement.

## E.  The Court Should Recognize Plaintiff's Claim of Violation of Public Policy

There are numerous articulations of public policy that an employer offering a former employee a severance benefit must deal fairly with that employee, and make adequate disclosures relating thereto. As mentioned above, under the OWBPA, one of the duties incumbent upon the employer is to supply the Plaintiff with clearly understandable information regarding exactly what the Plaintiff is to receive in exchange for his waiver. 29 U.S.C § 626 (f)(1)(A).

In the context of ERISA plans, a fiduciary, generally including the employer, has a duty to inform beneficiaries of material facts about the plan if there was some particular reason that the fiduciary should have known that his failure to convey the information would be harmful. Watson v. Deaconess Waltham Hospital, 298 F.3d 102, 114-115 (1st Cir. 2002). See also  Griggs v.  E.I. Dupost De Nemours & Co., 237 F. 3d 371, 381-82 (fiduciary learned that employee's planned rollover election was not possible under tax code, but failed to inform him); Barker v. American Mobil Power Corp., 64 F.3d. 1397, 1402-03 (9th Cir. 1995) (fiduciary suspected plan mismanagement and failed to inform beneficiaries);  Eddy v. Colonial Life Insurance Co., 919 F.2d 747, 749 (D.C. Cir. 1990) (plaintiff inquired about continuation rights for health insurance and fiduciary failed to inform him of conversion rights).

Failure to inform is a fiduciary breach where the fiduciary "knew of the confusion [detrimental to the participant] generated by its misrepresentations or its silence." Watson v. Deaconess Waltham Hospital, 298 F.3d 102, 115 (1st Cir. 2002), quoting  UAW v. Skinner Engine Co., 188 F.3d 130, 149 (3rd Cir. 1999).  See also  Griggs v.  E.I. Dupost De Nemours & Co., 237 F. 3d 371, 381("An ERISA fiduciary that knows or should know

that a beneficiary labors under a material misunderstanding of plan benefits that will inure to his detriment cannot remain silent . . ..).

On the facts set forth above, the Defendant deliberately evaded its duty to assist a former employee to understand the terms of the severance agreement. On facts such as these, the Court should recognize a duty on the part of the employer, to be forthcoming in response to requests for information regarding an offer of severance, and further, to offer clear information when the employer knows or should have known that the severance agreement is not clear or that the employee labors under some misapprehension as to the effect of the severance agreement. Further, the time for accepting a severance agreement should be tolled until the employer has made a good faith effort to supply such information.

The Plaintiff requests that the Court recognize that the Defendants have utterly failed in treating Plaintiff in a fair and equitable manner, and that these facts cry out for a remedy, The Plaintiff asks that this Court create such a remedy.

## <u>CONCLUSION</u>

Based upon the forgoing, the Plaintiff states that he has put forth evidence sufficient and/or articulated sufficient legal bases to overcome the Defendant's Motion for Summary Judgment, and requests that the Motion be denied.

                                    Respectfully submitted,
                                    Joseph Maher,
                                    By his Attorneys,


Dated:  February 19, 2005           /S/ Martha M. Wishart_____
                                    Martha M. Wishart (BBO No. 556694)
                                    McKenzie & Associates, P.C.
                                    44 School Street, Suite 1100

Boston, MA  02108
(617) 723-0400


## CERTIFICATE OF SERVICE

I, Martha M. Wishart, attorney for the Plaintiff in the above matter, hereby certify that on this 19th day of February, 2005, I caused a copy of the foregoing to be served electronically upon Doreen M. Zankoswi, Esq.; Debra Dyleski-Najjar, Esq. and Daniel Lyne, Esq. electronically via ECF.

_/S/_ Martha M. Wishart_____
Martha M. Wishart

26